IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | | |
|---|---|---|
| AMERICAN BUILDERS INSURANCE COMPANY, | § § § | |
| *Plaintiff*, | § § | Civil Action No. 6:22-cv-19 |
| v. | § § | JURY |
| DIAMANTE CUSTOM HOMES, LLC; BYRON BURRIS and LORI BURRIS, | § § § § | |
| *Defendants*. | § § | |

**PLAINTIFF AMERICAN BUILDERS INSURANCE COMPANY'S
COMPLAINT FOR DECLARATORY RELIEF**

This is a declaratory judgment action arising out of an underlying arbitration brought by Byron and Lori Burris (Byron Burris is referred to herein as "Burris" and Lori and Byron Burris are collectively referred to as the "Burrises") related to the construction of their custom home in Victoria, Texas. The Burrises contracted with general contractor Diamante Custom Homes, LLC ("Diamante") and claimed Diamante failed to manage the project and comply with the terms of their contract, resulting in numerous construction defects. Diamante, in turn, brought claims against subcontractors Corey Construction, LP ("Corey") and Donato Rodriguez ("Rodriguez") alleging they were responsible for a portion of the construction defects complained of by the Burrises.

The arbitrator entered an award against Diamante for $2,829,593.27 for the reasonable and necessary cost to correct and complete the project as a result of its breaches of contract related to (1) the failure to provide a full-time superintendent; (2) defects in the windows and sheathing installation; (3) defects in the construction of the roof; (4) defects in the stucco system and (5)

defects in the stone façade. The arbitrator also awarded $767,199.10 for the Burrises' attorneys' fees, expenses and expert costs and the return of $321,300.35 in builder's risk insurance proceeds.[1]

American Builders Insurance Company ("American Builders") seeks a declaration that there is no coverage because the insuring agreement is not satisfied and the application of the Texas Faulty Work Exclusion With Resulting Damage Coverage precludes coverage.

## PARTIES

1. Plaintiff American Builders Insurance Company is organized under the laws of the state of Delaware, with its principal place of business in Atlanta, Georgia.

2. Defendant Diamante Custom Homes, LLC is a Texas limited liability company with its principal place of business in San Antonio, Texas, and may be served with process by serving its registered agent JAS Development Corporation at 4725 College Park, Suite 200, San Antonio, Texas 78249. According to records filed with the Texas Secretary of State, the sole member of Diamante is JAS Development Corporation, a Texas corporation, with its principal place of business in San Antonio, Texas. Adam Sanchez, an individual residing in San Antonio, Texas, is also listed as the president of Diamante. Adam Sanchez and Olga Pastrano, individuals residing in San Antonio, Texas, are the only members of JAS Development Corporation's board of directors and Adam Sanchez is listed as the sole incorporator.

3. Defendant Byron Burris is an individual residing in Victoria, Texas, who may be served at his residence located at 205 Creekridge Dr., Texas 77904 or wherever he may be found.

4. Defendant Lori Burris is an individual residing in Victoria, Texas, who may be served at her residence located at 205 Creekridge Dr., Texas 77904 or wherever she may be found.

---

[1] The award is described in detail below and a true and correct copy of the award is attached hereto as Exhibit A, and is incorporated herein as though set forth verbatim.

## JURISDICTION AND VENUE

5. The Court has jurisdiction over the lawsuit under 28 U.S.C. § 1332(a)(1) because the plaintiff and defendants are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.

6. Venue is proper in the Southern District of Texas, Victoria Division under 28 U.S.C. § 1391(b)(1) because a substantial part of the events giving rise to the claim occurred and the property that is the subject of the action is situated therein.

## FACTS

**A.     The Underlying Arbitration**

7. This is an insurance coverage dispute arising out of an underlying arbitration[2] related to the construction of the Burrises' custom home.[3] The Burrises engaged Diamante to serve as the general contractor and Diamante hired subcontractors Corey to install the roof and Rodriguez to complete the framing and install the windows and sheathing system.

8. Burris and Diamante entered into a contract for the construction of the home on August 11, 2015, which included a number of requirements, including, in relevant part: all components are to be installed in accordance with the manufacturer's recommendations, code requirements and regulated building practices; provide control or expansion joints as required on stucco walls; all construction to conform to all local building codes and Diamante was to provide a full-time on site project superintendent for the life of the project.[4]

---

[2] *Byron Burris and Lori Burris v. Diamante Custom Homes, LLC v. Corey Construction, LP, EarthCore Industries, LLC, NT Stones, LLC, and Donato Rodriguez*, before Arbitrator Matthew J. Sullivan.
[3] The home is located at 387 Shannon Valley Drive in Victoria, Texas, 77904.
[4] *See* Exhibit A at p. 3-5.

3

9. Work began in May 2016 and construction was well underway when Hurricane Harvey hit Victoria on or about August 25, 2017. The hurricane undisputedly caused damage to the project, and Diamante began working with the builder's risk insurer to adjust the damage claim. Diamante decided to wait to start removing drywall until the insurance company determined the scope of removal that would be covered under the claim.

10. The Burrises complained about Diamante's lack of progress following the hurricane. On October 31, 2017, Diamante advised the Burrises that the builder's risk insurer had approved moving forward with repairs to the roof, stucco and replacement of all exterior doors.[5] On November 2, 2017, counsel for the Burrises sent a letter terminating the contract due to claims that Diamante "persistently and knowingly refuse[d] or fail[ed] to supply enough properly skilled workers or proper materials" and "fail[ed] to staff the project with a full-time supervisor, among other necessary staffing."[6] Counsel for the Burrises notified Diamante on November 22, 2017 that "there appear to be numerous issues of construction defects, generally involving framing and roofing…."[7]

11. The Burrises and Diamante were unable to resolve their differences through the Residential Construction Liability Act process; as a result, the Burrises brought the following claims against Diamante: request for declaratory judgment that the insurance proceeds should be returned to the Burrises, breach of contract, breach of warranty, negligence, gross negligence, violations of the Texas Deceptive Trade Practices Consumer Protection Act, fraudulent inducement, common law fraud, fraud in a real estate transaction, failure to provide an accounting,

---

[5] Diamante was paid $321,300.35 by the builder's risk insurer for repairs which were not performed.
[6] *See* Exhibit A at p. 6-7.
[7] *See id.* at p. 7.

4

breach of Chapter 162 of the Texas Property Code and breach of fiduciary duty. Diamante asserted breach of contract, indemnity, negligence and contribution claims against Corey and Rodriguez.

**B.   The Arbitration Award**

    **(1)   Findings**

12.    The arbitrator issued his award on April 22, 2022.[8] The arbitrator found as follows, in relevant part, with regard to the Burrises'[9] claims against Diamante:

> **a.   Burris' claims for damages related to Diamante's breach of contract were granted.[10]**
>
>> **i. Diamante failed to provide a full time superintendent and the evidence showed that even with the level of supervision provided by Diamante, there was a failure to properly supervise and direct the work.[11] The failure to properly construct the building envelope is systemic in all facets – roof, flashing, Zip sheathing, framing, windows, stucco, stone and cupula.[12] The evidence also established considerable defects in the sequencing and scheduling of the work so that the materials would be installed by the various trades in a manner that complies with normal building practices, codes, manufacturers' requirements and the standard of care expected of Diamante, Corey and Rodriguez.[13]**
>>
>> **ii. Defects in the windows and sheathing installation: While Diamante expected its subcontractors to properly install their respective portions of the work, the evidence also showed that Diamante's superintendent, Mr. Sorenson, showed Rodriguez how to install the windows and the Zip sheathing system and he acknowledged that a contractor is to install the windows in accordance with the manufacturer's instructions.[14] The evidence established that the windows – both Jeld Wyn and store front windows at radius walls – were not installed properly. The evidence also raised questions**

---

8    *See id.*
9    The arbitrator found Lori Burris was not a party to the contract and did not own an interest in the real property where the project is located; therefore, he determined Lori Burris had no standing to assert any claims. *See id.* at p. 9.
10    *See id.* at p. 11.
11    *See id.*
12    *See id.*
13    *See id.*
14    *See id.*

5

        with the Zip sheathing system and the lack of blocking at joints.[15] There was also testimony that Diamante had attempted to address leaks at the cupola for a long time, which reflects defects in its installation.[16]

    iii. **Defects in the construction of the roof:** The expert testimony established a host of defects in the construction of the roof and Corey acknowledged the failure to use the required fasteners, which requires the complete removal and replacement of the roof.[17]

    iv. **Defects in the stucco system:** The evidence also showed significant defects in the installation of the stucco and the need for extensive repairs to correct these defects.[18] The evidence established numerous failures of the stucco system to comply with the contract, applicable code and industry standards.[19] Mr. Ayers' testimony was also critical of Diamante's sequencing and coordination of work, as well as the Diamante superintendent's lack of experience.[20]

    v. **Defects in the stone façade:** The evidence showed failures to install weep holes in some areas outside of construction requirements, improper installation of stone coping trim, out of sequence work and other deficiencies.[21]

13. The Burrises' remaining claims for damages related to breach of warranty, negligence, gross negligence, violations of the Texas Deceptive Trade Practices Consumer Protection Act, fraudulent inducement, common law fraud, fraud in a real estate transaction, failure to provide an accounting, breach of Chapter 162 of the Texas Property Code and breach of fiduciary duty were denied.[22]

14. The arbitrator found as follows, in relevant part, with regard to Diamante's indemnity claims against Corey and Rodriguez:

---

15    *See id.*
16    *See id.*
17    *See id.*
18    *See id.* at p. 12.
19    *See id.*
20    *See id.*
21    *See id.*
22    *See id.* at p. 12-14.

6

    a.    **The subcontracts with both subcontractors include an indemnity clause at paragraph 21, which indemnified Diamante for damages that Diamante must pay due to the work performed by the subcontractor.[23] As discussed above, the work performed by these subcontractors caused damages to Burris.[24]**

    b.    **Corey admitted its failure to properly attach the roof and further admitted that the roof must be replaced.[25] The cost to correct the roof is $300,000.[26]**

    c.    **Rodriguez failed to install the Jeld Wyn windows in accordance with the manufacturer's instructions, is responsible for the errors in the framing and is partially responsible for the need to replace the entirety of the stucco due to the need to remove and replace the stucco at the windows.[27] The arbitrator determined that Rodriguez's responsibility for the repairs to the framing, windows, cupula, framing inspection and stucco is $298,933.[28]**

    d.    **Both subcontractors also share proportionately in the attorneys' fees and expenses incurred by Burris.[29]**

15.    The Total Principal Award of $2,829,593.27 was given to Burris for the "reasonable and necessary cost to correct and complete the Project" and his "cost of investigation," with a reduction for Burris' failure to mitigate damages and the remaining contract balance at the time of the termination.[30] The allocation of damages is as follows:

---

[23] *See id.* at p. 15.
[24] *See id.*
[25] *See id.*
[26] *See id.*
[27] *See id.*
[28] *See id.*
[29] *See id.*
[30] *See id.* at p. 17.

7

*Burris' recovery*

      a. **Burris shall recover $2,829,593.27 as damages for Diamante's breaches of contract.[31] Contingent on Diamante's delivery of $321,600.35 in insurance proceeds to Burris within 30 days of the award, the award will be reduced to $2,507,992.92.[32]**

      b. **Burris shall recover from Diamante pre-judgement interest at the rate of 5% per annum on the foregoing amount, which shall accrue from the date that Burris filed his lawsuit against Diamante through April 22, 2022.[33]**

      c. **Burris shall recover from Diamante the sum of $767,199.10 as reasonable and necessary attorneys' fees and expenses, arbitration fees and expenses and venue fees.[34]**

*Diamante's recovery*

      a. **Diamante shall recover from Corey:**
          i. **$300,000.00 for the portion of Burris' damages attributable to Corey; and**
          ii. **$85,071.43 for the portion of Burris' attorneys' fees, expenses and expert costs.[35]**

      b. **Diamante shall recover from Rodriguez:**
          i. **$298,933 for the portion of Burris' damages attributable to Rodriguez; and**
          ii. **$85,071.43 for the portion of Burris' attorneys' fees, expenses and expert costs.[36]**

**C.    The Underlying Policies**

16.    American Builders issued policy number PKG 0204592 00 to Diamante Custom Homes LLC and JAS Development Corp. effective November 1, 2015, to November 1, 2016, and policy number PKG 0204592 01, effective November 1, 2016, to November 1, 2017. The policies

---

[31]    *See id.* at p. 18.
[32]    *See id.*
[33]    *See id.* at p. 19.
[34]    *See id.*
[35]    *See id.*
[36]    *See id.*

provide commercial general liability coverage with limits of $1,000,000 per occurrence and $2,000,000 in the general aggregate.[37]

## BASES FOR THIS DECLARATORY JUDGMENT ACTION

17. American Builders, Diamante's commercial general liability insurer, seeks a declaration that there is no coverage for any portion of the arbitration award against Diamante because the insuring agreement was not satisfied and the application of the Texas Faulty Work Exclusion With Resulting Damage Coverage precludes coverage.

**A.    Insuring Agreement**

18. The policies' insuring agreement provides that American Builders will pay those sums Diamante becomes legally obligated to pay as damages because of "property damage" to which the insurance applies.[38] The insurance applies to "property damage" only if it is caused by an "occurrence" and "property damage" requires physical injury to tangible property.[39] "Occurrence" means an "accident, including continuous or repeated exposure to substantially the same general harmful conditions."[40]

19. In the construction-defect context, initial faulty construction or the mere incorporation of a faulty component into a larger project or system is not "property damage" and does not satisfy the insuring agreement.

20. Burris was awarded damages which do not satisfy the policy's insuring agreement because there was no "occurrence" which caused physical injury to tangible property. Specifically, the arbitrator relied on the following evidence in making his determination:

---

[37]    A true and correct copy of the policies are attached hereto as Exhibits B1 and B2, and are incorporated herein as though set forth verbatim.
[38]    *See* Exhibits B1 and B2 at Form CG 00 01 04 13, p. 1 (B1, p. 075; B2, p. 075).
[39]    *See id.; See id.* at Form CG 00 01 04 13, p. 15 (B1, p. 089; B2, p. 089).
[40]    *See id.* at Form CG 00 01 04 13, p. 15.

9

### (1) Failure to provide a full-time superintendent

<u>Testimony of Adam Sanchez, owner of Diamante:</u> Mr. Sanchez testified that Diamante was in charge of all management and supervision of trades. Mr. Sanchez agreed that having a full-time superintendent on the project was something he touted as a benefit to Mr. Burris about working with Diamante.

Mr. Sanchez testified that issues on Burris' end put the project on hold for about 9 months, during which time Diamante took on another project in the area. As a result, Diamante could no longer provide a full time superintendent to the project as written in the original contract documents, and Mr. Burris was aware of this issue. Mr. Sanchez noted pressure with sequencing because Diamante had to deal with all the changes throughout the project. The original contract was for 730 days of construction, and the change orders added another 8 months.

<u>Testimony of Russel Sorenson, Diamante superintendent:</u> Mr. Sorenson testified he split his time with the Burris and Rockport projects, so he either started his day or ended his day on the Burris project.

<u>Testimony of Jason Harmon, Diamante's construction manager:</u> Mr. Harmon testified his first assignments with Diamante were Mr. Burris' project and the Rockport job, which were about an hour to an hour and a half away from each other. Mr. Harmon stated this was the largest project he had ever supervised. Mr. Harmon testified that if he was the full-time superintendent for the Burris project, he would have had more time to coordinate the subcontractors and any job is improved by a full-time superintendent.

<u>Testimony of Brandon Ayers, Coastal Bend Stucco:</u> Mr. Ayers testified there was supervision on the project, but given the magnitude of the project, there should have been more supervision from someone more experienced as Mr. Harmon was straight out of college. Mr. Ayers testified that with full-time supervision, he would expect installation discrepancies would be caught.

Mr. Ayers testified that Diamante's superintendents didn't help coordinate work, so his crew would usually reach out to the other trades on site to make sure they wouldn't get in each other's way.

Mr. Ayers stated the Zip System was done incorrectly as to exterior beams on the back porch, which he told Mr. Harmon. In that instance, the framer came back to correct that condition so Coastal

10

Bend could install the stucco. Mr. Ayers indicated that the superintendent should have noticed these small issues.

Mr. Ayers testified that in his opinion, Diamante was responsible for the claims against Coastal Bend because of how Diamante directed Coastal to do its work and Diamante's lack of supervision on the project. These factors resulted in poor workmanship by Coastal and all of the other subcontractors and general turmoil on the project.

<u>Testimony of Byron Burris:</u> Mr. Burris testified that he always had a full-time superintendent on previous construction projects. A Diamante employee told Mr. Burris in an email that a superintendent would be "literally living at the job site" until he moves in. Mr. Burris also wanted a full-time superintendent given Diamante is based in San Antonio.

Mr. Burris testified that there were several instances where he visited the job site and there was no work being performed or no superintendent on site. Mr. Burris had his attorney contact Mr. Sanchez because he was concerned about the lack of supervision on the project. However, even after this communication, Diamante never assigned a full-time superintendent.

Mr. Burris testified that he believed his attorney's email constituted a demand to have a full-time superintendent on the project. Mr. Burris also stated he made verbal demands to the supervisors that they needed to be on site more often. Mr. Burris made this complaint about once a month, but this never changed.

<u>Testimony of Vernon Dunagin, registered architect and expert:</u> Mr. Dunagin testified that he could tell there were coordination issues in the project because there were no weep holes along the tile.

<u>Testimony of Chris Pastrano, Diamante's construction manager:</u> Mr. Pastrano opined that superintendents check on day to day activities, work on coordination of activities, work with the homeowner as to issues on site and any requests, monitor the quality of the subcontractors' work and keep the site secure. Mr. Pastrano testified that superintendents have the power to stop work if they determine work is being performed incorrectly. Mr. Pastrano testified that it was his responsibility to identify defects, not to repair them.

### (2) Defects in the windows and sheathing installation

<u>Testimony of Adam Sanchez</u>: Diamante had David Contreras II, PE with The Contreras Engineers, LLC come check Donato

11

Rodriguez's work in relation to wind storm requirements for an insurance rating. Contreras Engineers noted in their report that rafter top plate hurricane straps were not installed, stud to plate hurricane straps were not installed, header hurricane straps were not installed, there were multiple instances where tension ties were not installed or studs were not adequately secured, there were missing anchor bolts and the exterior wall was offset from the foundation. Mr. Sanchez stated he would expect Donato Rodriguez to address these issues while they were exposed.

Experts Mr. Parker and Mr. Frase looked into the walls of the home to see how it was constructed and whether or not the windows installed by Donato Rodriguez were flashed properly. Mr. Sanchez testified he was not aware that every window that was opened showed that Donato Rodriguez had dammed up the bottom of the sill and created a condition that all of the experts agreed needed to be repaired. Mr. Sanchez agreed that someone should have watched Donato install a window to make sure they could do it, but he did not recall whether this ever happened. Mr. Sanchez also agreed that if the windows were not flashed properly, then they were not constructed in a good and workmanlike manner.

<u>Testimony of Jason Harmon, Diamante's construction manager:</u> Mr. Harmon testified that the windows at the front of the house were misaligned and the then-present superintendent should have stopped the framer and told him to move the windows.

<u>Testimony of Chris Pastrano, Diamante's construction manager:</u> Mr. Pastrano agreed that the Jeld Wyn window warranty did not cover improperly installed windows and the windows that were tested did not have the sealant as required and therefore were not properly installed. Mr. Pastrano also agreed that the proper sequencing is stucco first and then stone, which was not followed on the project and he expected this issue would have been identified and corrected.

<u>Testimony of Jeffrey Gish, licensed professional engineer and expert:</u> Mr. Gish testified that he observed construction interfaces between differing materials that lacked appropriate sealant joints. For example, stucco was installed up to windows, which is deficient, as there should be a scheduled gap of uniform thickness around the window so the proper sealant can be applied.

Mr. Gish testified regarding deficiencies he noted with regard to the windows installed on the property. Specifically, some of the windows were installed out of center. To repair this defect, the stucco would have to be removed to the next scheduled transition in

the panel. Mr. Gish also testified the windows at the home lacked the required sealant joints between the window frame and adjacent ridge frames, the sill pans at the storefront glazing assemblies were inadequate to direct water to the exterior and windows were installed without sealant behind the nail fins. These conditions were all defective and do not constitute good and workmanlike construction.

The Zip System wall sheathing was defectively installed horizontally, with no blocking at the panel edges and improper fasteners. Mr. Gish testified that the IRC requires the products are installed per the manufacturer's instructions, which require blocking.

Testimony of Todd Glowka, a home builder and expert: Mr. Glowka testified that he observed the framing for the arches was so poor that each of the same shaped windows had different frames, which were framed differently from what the plans provided.

Testimony of Homer Parker, a forensic engineer and expert: Mr. Parker testified that he observed improper flashing on the windows. Mr. Parker also agreed that all of the nailing fin windows needed to be replaced.

### (3) Defects in the construction of the roof

Testimony of Vernon Dunagin, registered architect and expert: Mr. Dunagin testified that he accessed the roof and removed tile from five or six locations. Mr. Dunagin found there were sufficient corrosion resistant crown staples, but objected to the spacing of the staples which exceeded the 12 inch standard. Mr. Dunagin observed that the fasteners on the left side of the roof were 2.5 inch nails, which are a sufficient length to attach tile, but they were not corrosion resistant as required. On the right portion of the roof, there were black drywall screws used to attached tile that were also not corrosion resistant and therefore improper. Mr. Dunagin also testified there were no markings on the underlayment to identify it's manufacturer, in violation of the code.

Mr. Dunagin testified he observed a serious issue wherein multiple membranes were applied at an intersection of an upper roof overhang passing above the field of the lower roof. Organic felt was improperly employed along with self-adhering membrane, gaps and un-adhered membrane was present throughout the application. Further, there were areas with missing through-wall flashing at the clerestory wall. Mr. Dunagin agreed the roof needed to be removed and replaced.

Mr. Dunagin testified that in the replacement of the roof, all of the flashings and bird stop would have to come off along with the tile. Mr. Dunagin clarified that he recommends the entirety of the roof needs to be removed and re-roofed.

Testimony of Tyler Gibson, manager of the custom homes division of Corey Construction: Mr. Gibson agreed that galvanized fasteners are required by code. Mr. Gibson testified that he saw a non-galvanized fastener on a tile and realized they were used on the roof and had some oxidation. Once the use of incorrect fasteners was discovered in July 2021, Corey Construction decided the roof would need to be replaced.

Testimony of Adam Sanchez: Mr. Sanchez agreed that during the joint inspection of the fasteners holding down the tile on the roof in June 2021, the experts found that the fasteners were rusted because they were non-galvanized.

### (4) Defects in the stucco system

Testimony of Jeffrey Gish, licensed professional engineer and expert: Mr. Gish testified he observed separations at the mortared stucco-to-stone interfaces with no flashing visible which exposed the wall cavity and sheathing to direct moisture entry from the exterior. Mr. Gish also provided testimony that the stucco is not, in fact, three coat stucco as required by the plans. Mr. Gish testified that the home is a three cavity wall construction and should have included three coat stucco per the IRC. The hybrid stucco used was incorrect for a wood frame home under the code.

Testimony of Todd Glowka, a home builder and expert: Mr. Glowka stated the main issue with the stucco is that it wasn't flashed properly.

Testimony of Antonio Pina, a professional engineer and expert: Mr. Pina testified that complete removal and replacement of the stucco is required given the extent of the damage and the fact that the stucco is pigmented, not painted.

Testimony of Brandon Ayers, Coastal Bend Stucco: Mr. Ayers testified that at some points, he had to remove some of the stone work to install Z-flashing before he installed his stucco. Mr. Ayers testified that he recommended stucco should be off any hard surface by 2 inches, but Diamante didn't want this finish as it was "ugly."

14

Mr. Ayers testified that he would completely remove the 3 misaligned windows at the front of the home and the stucco in the surrounding area and reset the window, waterproof, lathe, plaster and re-skim the entire panel and apply base coat and new color so you couldn't tell the area was patched. However, Mr. Ayers agreed that the stucco would be weathered within 6 months and would be darker than a new application of stucco. The only way to avoid the stucco being different colors would be to skim the entire home and apply new stucco.

### (5) Defects in the stone façade

<u>Testimony of Jeffrey Gish, licensed professional engineer and expert:</u> Mr. Gish also noted off sequencing and odd workmanship throughout the project, such as adhered stone installed directly onto metal lath instead of adhered to a scratch coat and reinforcing wire matrix.

<u>Testimony of Todd Glowka, a home builder and expert:</u> Mr. Glowka testified that the stone inside the house was improperly applied to various locations prior to the sheetrock installation. Mr. Glowka opined that the stone will have to be removed and reapplied after the sheetrock is installed so there will not be a perpetual crack where the two join.

<u>Testimony of Brandon Ayers, Coastal Bend Stucco:</u> Mr. Ayers testified regarding instances wherein he suggested work be performed a certain way, which he contends was good and workmanlike, but Diamante told him to perform the work in another way that was cheaper, potentially hazardous or incorrect in his opinion. For example, Mr. Ayers testified regarding fire hazards he noted related to the chimneys on the project, including grout that was to be applied to connect the exterior cladding to the stone and materials installed inside the chimneys.

<u>Testimony of Adam Sanchez</u>: Mr. Sanchez testified regarding issues with outdoor lighting being installed in the wrong place and sequencing issues with antique stone being placed over natural stone.

### B. Texas Faulty Work Exclusion With Resulting Damage Coverage

21. The policies' Texas Faulty Work Exclusion With Resulting Damage Coverage provides there is no coverage for any claim or "suit" for the cost of repair, replacement, removal, loss of use, inspection, disposal or otherwise making good any faulty, defective or poor

15

workmanship in "your work" for which any insured or any insured's employees, contractors or subcontractors may be liable.[41] "Your work" means work or operations performed by Diamante or on its behalf or materials, parts or equipment furnished in connection with such work or operations.[42]

22. The arbitrator's Total Principal Award was for the "reasonable and necessary cost to correct and complete the project" and the "cost of investigation."[43] Accordingly, the entirety of the arbitrator's award falls within the terms of the exclusion for repair, replacement and inspection of defective workmanship by Diamante or its subcontractors. American Builders fully incorporates the listed evidence the arbitrator relied upon to make his determination in paragraph 21, above, herein.

23. Given these damages do not constitute property damage, the insuring agreement is not satisfied. Furthermore, these damages related to Diamante and its subcontractors' faulty workmanship require repair or replacement. Consequently, the Texas Faulty Work Exclusion With Resulting Damage Coverage applies, and American Builders has no obligation to indemnify Diamante for such damages, judgments, settlements or defense costs related to the underlying arbitration.

## CAUSE OF ACTION FOR DECLARATORY JUDGMENT

24. Pursuant to 28 U.S.C. § 2201 and Federal Rule of Civil Procedure 57, American Builders Insurance Company requests that this Court declare its coverage obligations, if any, under the policies in relation to the underlying arbitration.

---

[41] *See* Exhibits B1 and B2 at Form GL RFWETX 01 15 (B1, p. 128; B2, p. 128).
[42] *See id.* at Form CG 00 01 04 13, p. 16 (B1, p. 090; B2, p. 090).
[43] *See* Exhibit A at p. 17.

25. American Builders seeks a declaration that the damages awarded by the arbitrator in the underlying arbitration are not covered under the policies and that American Builders has no duty to indemnify Diamante or any other person or entity in connection with the underlying arbitration.

26. Alternatively, American Builders seeks a declaration that because of the policies' Texas Faulty Work Exclusion With Resulting Damage Coverage, there is no coverage for damages that were the result of repair, replacement, removal, loss of use, inspection, disposal or otherwise making good any faulty, defective or poor workmanship in Diamante or its subcontractors' work. Therefore, American Builders has no obligation to indemnify Diamante for any damages, judgments, settlements or defense costs excluded by the provision.

27. Alternatively, American Builders seeks a declaration that because of the policies' insuring agreements, there is no coverage for damages that do not arise out of physical injury to tangible property. Accordingly, the insuring agreement is not triggered and American Builders has no duty to indemnify Diamante for such damages, judgments, settlements or defense costs related to the underlying arbitration.

## JURY DEMAND

28. American Builders demands a trial by jury on all issues of fact.

## PRAYER

THEREFORE, American Builders Insurance Company prays that it be granted the following relief from this Court:

1. A declaration that American Builders has no duty to indemnify Diamante or any other persons or entities, including any of the defendants hereto, under the policies with regard to the underlying arbitration;

2. Costs of court; and

3. All other and further relief, at law or in equity, to which American Builders may be justly entitled.

DATED: May 18, 2022

          Respectfully submitted,

          *s/ Joseph A. Ziemianski*
          Joseph A. Ziemianski
          Attorney-in-Charge
          Texas State Bar No. 00797732
          COZEN O'CONNOR
          LyondellBasell Tower
          1221 McKinney Street, Suite 2900
          Houston, Texas 77010
          Telephone: (832) 214-3900
          Facsimile: (832) 214-3905
          E-mail: jziemianski@cozen.com

          OF COUNSEL:

          COZEN O'CONNOR

          Rebecca N. Martinez
          Texas State Bar No. 24116725
          (Address, phone numbers and firm as above)
          E-mail: rmartinez@cozen.com

          ATTORNEYS FOR PLAINTIFF,
          AMERICAN BUILDERS INSURANCE
          COMPANY