BYRON BURRIS and LORI BURRIS    §
*Intervenors / Claimants,*    §
   §
*v.*    §
   §
DIAMANTE CUSTOM HOMES, LLC    §
   §
   *Defendant / Respondent,*    §
   §
*v.*    §
   §
COREY CONSTRUCTION, LP,    §
EARTHCORE INDUSTRIES, LLC,    §
NT STONES, LLC, and DONATO    §
RODRIGUEZ,    §
   §
   *Third-Party Defendants /*    §
   *Respondents.*    §

Matthew J. Sullivan, Arbitrator

---

## FINAL AWARD

I, the undersigned Arbitrator, Matthew J. Sullivan, having been designated in accordance with the arbitration agreement entered into between the parties identified below, have duly reviewed the pleadings, evidence, testimony, arguments of counsel, and the proofs and allegations of the parties, hereby issue this Reasoned Final Award.

### Parties and Counsel

The Parties, defined below, initiated this arbitration with a Rule 11 Agreement dated October 14, 2021. The Parties participated in litigation for several years prior to commencing this arbitration. The Parties, and their counsel include:

Intervenors/Claimants:    Byron Burris and Lori Burris
   Represented by Kustoff & Sanders, LLP
   Daniel O. Kustoff
   Melanie H. Sanders
   Taylor L. Crull

Respondent:    Diamante Custom Homes, LLC
   Represented by: Donnell, Kieschnick, Wolter & Gamez, P.C..
   Patrick Wolter
   Clay Coalson

ABIC'S DJ
EXHIBIT A

Lewis Brisbois Bisgaard & Smith, LLP
Jason Powers
Joelle G. Nelson
Jacqulyn P. Jandrucko

Third Party Defendant Respondent Corey Construction, LP
Represented by: Weycer, Kaplan, Pulaski & Zuber, P.C.
Murphy S. Klasing
Cavyn Sanders

Third Party Defendant Respondent Donato Rodriguez.
Represented by: Hartline Barger LLP
Thomas G. Jacks
Trevor Brown
J. David Henderson

Byron and Lori Burris, Diamante Custom Homs, LLC ("Diamante"), Corey Construction, LP ("Corey Construction"), and Donato Rodriquez are singularly a "Party" and collectively the "Parties."

### Site Visit and Evidentiary Hearing

On January 17, 2022, a site visit and pre-hearing conference between the Arbitrator and all counsel was conducted at the residence that is the subject of this dispute.  An evidentiary hearing before the Arbitrator began in Victoria, Texas on January 18, 2022, with in-person and deposition testimony through January 28, 2022.  The Arbitrator reviewed deposition testimony through January 31, 2022.  Several hundred exhibits were received and admitted and the following witnesses provided testimony during the course of the hearing:

Adam Sanchez
Russell Sorenson
Brandon Ayers
Byron Burris
Jason Harmon
Chris Pastrano
Jeff Gish
Todd Glowka
Donato Rodriguez
Daniel Schmidt
Gustavo Arredondo
Antonio Pena
Angel Ramirez
Michael Riojas
Steven Frase
Warren French
Homer Parker

Chester Spaulding
Tyler Gibson

### Background Facts

Byron Burris ("Burris") has an ownership interest in a tract of land that is part of a family limited partnership with other family members in Victoria, Texas. Burris and his wife desired to build a house on this property that is adjacent to a house owned by another Burris family member. Because the property is not owned jointly between Mr. and Ms. Burris, Burris is the party that contracted for the design and construction of the new residence. He liked the design of homes by Gustavo Arredondo ("Arredondo"), a home designer based in San Antonio, and he hired Arredondo to provide design services for a new house (the "Project") on the Burris family property. Arredondo and Burris signed a professional services agreement ("PSA") dated June 6, 2013 (accepted on June 10, 2013), for the design of the Project and the PSA did not include any construction administration services. Arredondo is not an architect registered in the State of Texas, but in Texas a building designer is allowed under the law to design single family homes.

Arredondo prepared a basic set of design plans for the construction of the Project and the PSA required Arredondo to prepare floor plans, all elevations, typical details and sections, foundation plans by a registered engineer, electrical layouts, framing plans, and roof plans (collectively, the "Plans"). The PSA required Arredondo to deliver Plans that are sufficient to adequately describe the work for construction and bidding purposes. Notably, sheet A-2 of the Plans includes 58 notes that place a number of obligations on the contractor ("Builder") and purports to exculpate Arredondo from a number of responsibilities. Among the important clarifications[1]:

a.   Builder is to contact Arredondo of any discrepancies in the Plans prior to starting the work (note 2);

b.   Builder accepts full responsibility for checking the Plans for conformity to local building codes and if the builder makes any changes to the Plans without contacting [Arredondo] then the Builder accepts liability for the amended Plans (note 3);

---

[1] Exhibit F, sheet A-2

c.      Designer accepts no responsibility for errors or negligence of the roofing contractor concerning flashing and waterproofing on the Project (note 5);

d.      The Plans do not show typical detailing and/or waterproofing (note 7);

e.      The Plans do not specify actual products and material selections and the Builder accepts full responsibility for all appropriate and proper detailing for and between all actual products/materials selected when installed (note 8);

f.      All components are to be installed in accordance with the manufacturers' recommendations, code requirements, and regulated building practices (note 9);

g.      All dimensions to be verified in the field and report any discrepancies, errors, and omissions (note 13);

h.      In case of discrepancies or conflicts in the drawings and specifications contact the designer or owner before proceeding with the work (notes 19 and 56);

i.      Provide control or expansion joints as required on stucco walls (note 26); and

j.      All construction to conform to all local building codes (note 54).

Burris obtained construction bids from three builders. Two of those, Todd Glowka Builder, Inc. ("Glowka") and Diamante Custom Homes, LLC, are based in San Antonio. Glowka's bid was the highest and Diamante's was the middle bid. The lowest bid was one million dollars lower than Diamante's bid and that concerned Burris.

Burris and Diamante signed a contract dated August 11, 2015, that is based on the American Institute of Architect's Standard Form of Agreement Between Owner and Contractor where the basis of payment is a Stipulated Sum—often referred to as the A101 Agreement. The A101 Agreement defines the "Contract Documents" as the A101 Agreement, the A201 General Conditions, the Plans (including the Foundation design by Spaulding Structural Engineering, Framing design by Spaulding Structural Engineering, and geotechnical engineering soils report by TSI Laboratories), other documents listed in the A101 Agreement, and Modifications (Change Orders) issued after the A101 Agreement is signed by the parties. Section 4.3 of the A101 Agreement identifies an "executed Proposal with Allowance items

and exclusions" and, therefore, it is one of the "other documents listed in the A101 Agreement" and a Contract Document.  Moreover, section 9.1.4 of the A101 Agreement makes an additional reference to the Proposal and states that:

> "Executed Proposal shall serve as basis of allowance items and construction specifications[.] A Design by Gustavo Arredondo did NOT do [sic] include construction specifications.  The specifications will be developed by Contractor from the executed proposal attached as Exhibit A and provided to Owner for review."

There was no evidence that Diamante prepared a separate Specification document for Burris' review.

Burris testified that he wanted a full time superintendent and Mr. Sanchez acknowledged that having a full-time superintendent was a benefit.  Indeed, the Contract reflects the understanding that Diamante was to provide a "[f]ull-time on site Project Superintendent for the life of the project…" Burris expressed concern that supervision be present on site at all times, particularly since Diamante is not a local Victoria contractor.  Full time supervision was included in the Contract Sum, and it is not disputed that Diamante did not provide full time supervision.

Diamante argues that Burris waived the requirement that a full-time superintendent be assigned to the Project.  Mr. Sanchez testified that there was a period of time of approximately nine months between the negotiation of the Contract and its actual execution.  In that period of time, Diamante entered into another agreement with a client in Rockport, Texas.  As a result, Diamante decided to split that superintendent's time between the Rockport and Burris projects.  When Burris did complain about the lack of supervision, Mr. Sanchez explained that the superintendent was working on the Project and another Diamante project located in Rockport.  Both Burris and Mr. Sanchez provided considerable testimony relating to this issue.

Based on the testimony, I do not find that Burris waived the requirement that Diamante provide a full-time superintendent.  The Contract is clear in this requirement.  In fact, as discussed in more detail below, the failure to meet the standard of care in regard to the quality of construction, sequencing, techniques, and construction means and methods reflects the lack of full time supervision.  Also, the

lack of proper supervision by Diamante reflects a failure to supervise and direct the Work (as that term is defined in the Contract), using Diamante's best skill and attention.  The absence of a full time superintendent resulted in a failure to enforce strict discipline and good order among the persons conducting the Work, which is another failure to comply with the Contract in order to meet the standard of care expected of a general contractor.  The evidence reflects multiple failures of Diamante's subcontractors, including but not limited to Corey Construction and Donato Rodriguez, to perform the Work in compliance with their obligations.

Hurricane Harvey arrived in Victoria on or about August 25, 2017, and it is not disputed that it caused some damage to the Project.  Diamante began working with the builder's risk insurer to adjust the damage claim and on September 18, 2017, Diamante advised Burris that it would begin to clean and remediate, but Diamante was attempting to convince the insurer to replace all of the drywall.  Diamante expressed a preference to wait to start removing drywall until the insurance company answered the question on the scope of removal that will be covered under the claim.

Burris complained about Diamante's lack of progress following the hurricane.  On September 28, 2017, Diamante advised Burris that removal of sheetrock would begin in the middle of the first week of October, but Mr. Sanchez was expecting to hear back from the insurer as to whether this was approved.  Mr. Sanchez did state that the work would progress with or without approval from the insurer.  Five days later, Diamante advised Burris that the builder's risk insurer had advised Diamante not to touch the house until they send a forensic engineer to inspect the damage and that inspection was scheduled for October 10, 2017.  On October 31, 2017, Diamante advised Burris that the builder's risk insurer has approved moving forward with the repairs to the roof, stucco, and replacement of all exterior doors.

On November 2, 2017, counsel for Burris sent a letter terminating the Contract due to claims that Diamante "persistently and knowingly refuses or fails to supply enough property skilled workers or

proper materials" and "failure to staff the project with a full-time[2] supervisor, among other necessary staffing.[3]"  After several exchanges of letters and emails between counsel for Burris and Diamante, it became clear by November 20, 2017 that the Contract was terminated.  Burris and Diamante's counsel began to exchange information regarding a reconciliation of the Contract Sum following termination, and counsel for Burris notified Diamante on November 22, 2017 that "there appear to be numerous issues of construction defects, generally involving framing and roofing (in addition to the roof tiles being class 3, not class 4)[4]

Counsel for Burris sought to have Diamante waive the Residential Construction Liability Act "RCLA" notice requirements in late January 2018 and advised that Burris was prepared to move forward with Todd Glowka Builder to repair and complete the Project. Diamante, however, did not agree to waive the RCLA process and insisted on an opportunity to inspect the Project and was "ready, willing, and able to perform any repairs arising from any deficiencies in the work of our subcontractors."[5]  The RCLA notice letter was sent on February 4, 2018, and considerable time was spent during the hearing as both Burris and Diamante explained the efforts to reach agreement on the scope of repairs.  Experts inspected.  Spreadsheets were exchanged.  Clarifications on the scope of repair were discussed.  Some repairs were accepted by Burris and others remained open for discussion.  By the end of September, the parties appeared to be at an impasse.  Based on evidence provided during the hearing, I determine that Diamante did not make a reasonable offer of repair because the offer did not fully address all of the defects.

There was considerable discussion concerning Diamante's payment of a referral fee to Arredondo, which was not disclosed to Burris.  The Contract is a stipulated sum agreement and is not a cost-plus agreement where the owner is entitled to detailed breakdowns of cost along with complete

---

[3] Ex. 15
[4] Ex. 19
[5] Ex. 661

transparency due to the fiduciary obligations normally included in a cost-plus agreement. While perhaps the inclusion of a referral fee within the Contract Sum is information that Burris would have liked to know about, it is simply a portion of the overall contract cost that Burris considered as fair and reasonable to construct the Project.

The Contract reflects a "Contract Sum" of $3,527,892.00, and that amount was modified in accordance with the terms of the Contract by a total of 43 approved Change Orders. At the time that Change Order number 45 was approved by Burris (numbers 18 and 19 were not approved) , the Contract Sum was increased to $3,819,594.08. While there was considerable time spent during the hearing discussing the calculation of overhead and profit, Mr. Sanchez correctly noted that the Contract allows him to calculate the increase based on a margin.

### Claims and Defenses of the Parties

Byron & Lori Burris' Claims.

    A.   Request for Declaratory Judgment that the insurance proceeds should be returned to Burris;

    B.   Breach of Contract Against Diamante;

    C.   Breach of Warranty Against Diamante;

    D.   Negligence and Gross Negligence Against Diamante;

    E.   Violations of the Texas Trade Practices-Consumer Protection Act ("DTPA") Against Diamante;

    F.   Fraudulent Inducement, Common Law Fraud, Fraud in a Real Estate Transaction Against Diamante;

    G.   Failure to Provide an Accounting;

    H.   Breach of the Texas Construction Trust Fund Statute-Chapter 162 of the Texas Property Code by Diamante;

    I.   Breach of Fiduciary Duty Against Diamante.

Diamante's Defenses and Third Party Claims.

    Diamante asserted a number of affirmative defenses, and the most salient ones are:

A.   a denial of any misrepresentation for the reason that the alleged misrepresentations were merely puffing and not actionable;

B.   Burris failed to mitigate the damages;

C.   Act of God;

D.   Limitations on damages in the Residential Construction Liability Act;

E.   Economic loss doctrine;

F.   Economic waste doctrine;

G.   Lack of standing by Lori Burris.

H.   Waiver of consequential damages pursuant to the Contract.

Diamante also seeks its attorneys' fees in compliance with the Uniform Declaratory Judgment Act.

Diamante asserted Third Party Claims against a host of subcontractors and others in the lawsuit. At the time of the hearing in this arbitration, only two third-party defendants remained—Corey Construction and Donato Rodriguez. Diamante asserted breach of contract, indemnity, negligence, and contribution claims against both of these third-party defendants.

Donato Rodriguez's Defenses.

Rodriguez' most salient defenses include failure to mitigate, economic waste doctrine, economic loss doctrine, and credit/offset from settling parties.

Corey Construction's Defenses.

Corey Construction's most salient defenses include failure to mitigate and economic loss doctrine.

## Arbitrator's Findings

Lori Burris is not a party to the Contract for construction of the Project and does not own an interest in the real property where the Project is located. Accordingly, Lori Burris has no standing to assert any claims and the Arbitrator's Award is limited to an award relating to the claims between Burris and Diamante and Diamante's indemnity claims as discussed in more detail below.

### Request for Declaratory Judgment

The Contract required Burris to obtain a builder's risk policy to insure against physical damage to the Project during construction.  The Contract contemplates the possibility that the Owner may not purchase the builder's risk policy (referred to in the Contract as the "Owner's property insurance") and further provides that if Owner Burris did not intend to purchase the property insurance then Diamante may obtain the coverage and the cost of the insurance would be paid by Change Order.  Indeed, Diamante obtained builder's risk insurance from Cypress Texas Lloyds (policy CBROTX0089#1).  As noted in the background facts, Hurricane Harvey damaged the Project and the builder's risk insurer paid the sum of $321,300.35 to Diamante.  Following termination of the Contract, Diamante refused to pay the insurance proceeds to Burris and has held those funds in a non-interest bearing account.  The evidence also establishes that Diamante believed that that damage exceeds this amount and Exhibit 220 is an estimate from May 5, 2018, post-termination, where Diamante calculated damages of $910,110 including the complete removal and replacement of the dome over the primary bathroom suite, removal of all insulation, and other costs more fully outlined in that exhibit.  The insurer did not pay this higher amount and Diamante—or another entity controlled by Mr. Sanchez—continues to hold that money.

Although Diamante procured the builder's risk insurance, section 11.3.8 of the A201 General Conditions still contemplates that any loss under the Owner's property insurance would be adjusted by the Owner as fiduciary and the proceeds would be paid to the Owner "as fiduciary for the insureds, as their interests may appear, subject to requirements of any applicable mortgagee clause."  The Contract does not delete sections 11.3.8 through 11.3.10 in the event that the Contractor procures the builder's risk insurance, so in reading the four corners of the Contract I determine that the proceeds should have been paid to the Owner in accordance with the terms of the Contract.  If Diamante did not procure a builder's risk policy with endorsements that comply with the Contract's requirements for handling the insurance proceeds, then that is a failure of Diamante to comply with the Contract.  But for the termination of the Contract, the Owner would have been required to pay those proceeds to Diamante as Diamante and its subcontractors performed the repairs.  But the Contract was terminated and Diamante

did not perform the repairs.  The insurance proceeds should be paid to the Owner as contemplated by the Contract and Diamante and because the measure of damages includes the cost to repair and complete, which includes repairs that were due to the damage caused by the hurricane, Diamante is entitled to an offset off of the damage calculation contingent on Diamante's payment of the $321,300.35 to Burris.

### Claim for Damages Relating to Breach of the Contract

Burris' claim for damages relating to Diamante's breach of the Contract is granted.  To reach this decision, the Arbitrator first looks to the terms of the Contract.  As established by Burris, Diamante failed to provide a full time superintendent and the evidence shows that even with the level of supervision provided by Diamante there was a failure to properly supervise and direct the Work.  The failure to properly construct the building envelope is systemic in all facets—roof, flashing, Zip sheathing, framing, windows (finned Jeld Wen and radial plate glass), stucco, stone, and cupula.  The evidence also established considerable defects in the sequencing and scheduling of the Work so that the materials would be installed by the various trades in a manner that complies with normal building practices, codes, manufacturers' requirements, and the standard of care expected of Diamante, Corey, and Rodriguez.

Defects in the windows and sheathing installation: While Diamante expected its subcontractors to properly install their respective portions of the Work, the evidence also showed that Diamante's superintendent, Mr. Sorenson, showed Rodriguez how to install the windows and the Zip sheathing system and he acknowledged that a contractor is to install the windows in accordance with the manufacturer's instructions.  The evidence established that the windows—both Jeld Wyn and storefront windows at radius walls--were not installed properly.  The evidence also raised questions with the Zip sheathing system and the lack of blocking at joints.  There was also testimony that Diamante had attempted to address leaks at the cupula for a long time, which reflects defects in its installation.

Defects in the construction of the roof:  The expert testimony established a host of defects in the construction of the roof and Corey Construction acknowledged the failure to use the required fasteners which requires the complete removal and replacement of the roof.

Defects in the stucco system:  The evidence also showed significant defects in the installation of the stucco and the need for extensive repairs to correct these defects.  The evidence established numerous failures of the stucco system to comply with the Contract Documents, applicable code, and industry standards.  Mr. Ayers' testimony also was critical of Diamante's sequencing and coordination of work, as well as the Diamante superintendent's lack of experience.

Defects in the stone façade:  The evidence showed failures to install weep holes in some areas or outside of construction requirements, improper installation of stone coping trim, out of sequence work, and other deficiencies.

The Arbitrator was presented with evidence during the course of the two week hearing including extensive testimony by many experts regarding the various deficiencies and the need to correct and complete the Work.

### Claim for Damages Relating to Breach of Warranty

Burris' claim for damages relating to Diamante's breach of warranty is denied.  Burris argues that Diamante breached the warranty contained in section 3.5 of the A201 General Conditions "that the Work will be of good quality and new . . . conform to the requirements of the Contract Documents and will be free from defects, except for those inherent in the quality of the Work the Contract Documents require or permit.  Work not conforming to these requirements may be considered defective."  Burris and Diamante contracted for that warranty, but the Contract defines the inception of that warranty at the time of Substantial Completion.  *See* section 9.8.4 of the A201 General Conditions.  It is not disputed that the Project did not achieve Substantial Completion, which is the date that Burris would be able to take beneficial use and occupancy of the Project.  To be clear, there was satisfactory evidence provided during the hearing that established that the Work is not of good quality and did not conform to the requirements of the Contract Documents and was not free from defects.  The evidence showed that there were multiple failures to construct the Project in accordance with the applicable building codes.  At this stage, all of these failures are essentially breaches of the Contract and are addressed as part of that cause of action.

### Negligence and Gross Negligence

The negligence and gross negligence claims are denied based on the economic loss rule.  The dispute in this matter involves the construction of the Burris residence, which is the subject of the Contract between Burris and Diamante.  Burris' pleading asserting the negligence and gross negligence claims seek damages for the negligent performance of the Contract.  Specifically, Burris claims that "Diamante had a duty to complete construction of the residence in a good and workmanlike manner, free from defects and in accordance with codes and regularly accepted construction practices in Victoria County."  *See* Burris First Amended Plea in Intervention paragraph VII (B).  Each of these alleged breaches of duty are rooted in the Contract Documents.  The nature of Burris' damages sound in the law of contract, as well.

Diamante, Rodriguez, and Corey Construction each asserted the economic loss rule to bar the negligence claims of Burris and briefed this defense as part of the post-hearing efforts.  While there is ample evidence of negligence by each of these parties in connection with the performance of the Work, the application of the economic loss rule as plead by these parties does bar the negligence and gross negligence claims as a matter of law.

### Violations of the Texas Trade Practices-Consumer Protection Act ("DTPA") Against Diamante

Burris' claims for violations of the DTPA are denied.  The Arbitrator agrees with Diamante's arguments that the evidence provided at the hearing did not establish that Diamante violated the DTPA.

### Fraudulent Inducement, Common Law Fraud,

### Fraud in a Real Estate Transaction Against Diamante

Burris' fraud claims are denied.  While there were discussions between Burris and Diamante regarding the need for a full-time superintendent, that obligation was actually included as part of Diamante's obligations under the Contract.  The Arbitrator agrees with Diamante's arguments and does not find that Diamante intentionally deceived Burris; instead, Diamante failed to comply with its obligation to provide a full-time superintendent.

### Failure to Provide an Accounting

Burris argues that Diamante failed to provide an accounting of costs.  But the accounting was demanded after the termination of the Contract and I am not persuaded that there is a continuing contractual obligation to provide the accounting following termination.   While the Contract does contemplate an obligation by the Contractor to provide certain back-up relating to its applications for payment, that process ends with termination.  The cost information was certainly discoverable as part of the litigation process, and Diamante ultimately provided its cost information, albeit after considerable efforts to compel production.

### Breach of Chapter 162 of the Texas Property Code by Diamante

Burris argues that Diamante breached Chapter 162 of the Texas Property Code because Burris is a beneficiary of the funds paid to Diamante.  The essence of Burris' complaint is that Diamante overbilled the Project, at best, and fraudulently overbilled, at worst.  The evidence reflects that Diamante received $2,601,828.67 and the actual Job Costs reflect expenses of $2,143,702.98.  Burris asserts that Diamante "took" the difference of $502, 272.49 as overhead and profit.  A review of the payment applications reflects a schedule of values based on AIA Document G702, a common industry form.  The schedule of values does not break out separately the contractor's overhead, profit, or contingency.  In a cost-plus contract, these sums are typically broken out by the contractor as part of the transparency in a cost-plus arrangement.  A contractor is entitled to include its overhead, profit, and contingency as part of its monthly progress payments.  There may be some evidence of overbilling, I do not find that Diamante breached Chapter 162 of the Texas Property Code.

### Breach of Fiduciary Duty Against Diamante

Burris claims that Diamante breached a fiduciary duty is a restatement of its claim for violation of chapter 162 of the Texas Property Code and is addressed in my discussion above.

### Indemnity Claim by Diamante

The economic loss rule disposes of the contribution claims on the tort actions and the Arbitrator denies the DTPA claims, which eliminates any contribution under the DTPA.  Diamante also asserts

indemnity claims against subcontractors Corey Construction and Rodriguez.  The subcontracts with both of these subcontractors includes an indemnity clause at paragraph 21, which indemnifies Diamante for damages that Diamante must pay due to the work performed by the subcontractor.  As discussed above, the work performed by these subcontractors caused damages to Burris.

Corey Construction admitted its failure to properly attach the roof and further admits that the roof must be replaced.  The cost to correct the roof in the damage analysis below is $300,000, which equates to 9.8% of the total cost of repair of $3,065,133.14.

Donato Rodriguez failed to install the Jeld Wyn windows in accordance with the manufacturer's instructions, is responsible for the errors in the framing, and partially responsible for the need to replace the entirety of the stucco due to the need to remove and replace the stucco at the windows.  I determine that Donato Rodriguez's responsibility for the repairs to the framing, windows, cupula, Spaulding framing inspection, and stucco is $298,933, which equates to 9.8% of the total cost of repair of $3,065,133.14.

In addition to the damages discussed above, both subcontractors share proportionately in the attorneys' fees and expenses incurred by Burris.  Both subcontractors objected to the evidence provided by Diamante regarding the apportionment of its attorneys' fees and expenses.  The Arbitrator grants the objections and does not award any of Diamante's attorneys' fees against the subcontractors.

### Resolution of All Claims on the Merits

This Award is intended to dispose of all claims on the merits asserted in this proceeding.

### Damages

Diamante argues that Burris failed to mitigate his damages by taking virtually no action to protect the house following Burris' termination of the Contract.  Although the house had most of its exterior installed, the evidence does reflect that there was no effort to mitigate the degradation of the building materials at the Project.  While Burris took the significant step of terminating the Contract and then engaged in the RCLA process, Burris did not contract with a completion contractor to correct the numerous deficiencies and complete the house.  The crux of Burris' explanation for not mitigating any damages from late 2017 through September of 2018 is that Diamante insisted on following the RCLA

process.  The extreme length of time for this process was extended by agreement between Burris and Diamante and yet there were no efforts to try to temporarily dry-in the house at any time, including after the conclusion of the RCLA process.  At that point in time, it was up to Burris to move forward to complete the Project.  That appears to have been the original intent in January 2018 when Burris obtained the completion and correction quote from Glowka on a cost-plus basis.

There was testimony regarding the escalation of construction costs through the date of the arbitration hearing and the damages experts for both Burris and Diamante had difficulty explaining their damage analysis and had to correct errors or omissions in the analysis and calculations.

The Arbitrator finds that the escalated costs could have been mitigated if Burris had undertaken to correct and complete the house when it was apparent that Diamante was not going to perform the repairs following the extensive period invested in the unsuccessful RCLA process.  Both of the experts for Burris and Diamante acknowledged cost increases due to time, Covid 19, and other reasons.

As reflected in Exhibit 578, as of January 24, 2018, Burris could have contracted with Todd Glowka Builder for approximately $3,040,990.50 to correct and complete the project.  While that estimate was prepared on a cost-plus basis and not a lump sum agreement, the estimate generally reflects the reasonable and necessary cost to complete the Project and was based on hard bids for the known scope of work at that time.  However, additional defects were identified following the preparation of that proposal as part of the RCLA process.

The Arbitrator agrees with Diamante's argument that the cost to repair and complete the Project must be reduced by the Contract balance.  The Contract Sum plus Change Orders totals $3,819,594.08.  Diamante received the sum of $2,601,828.67, which leaves a contract balance of $1,217,765.41.[6]  This is the amount that Burris reasonably expected to pay, in addition to the sum previously paid, to obtain a house that was built in accordance with the Contract Documents.  Of course that amount might go up or down once there was a final reconciliation of the remaining allowance items.

---

[6] The amount expressed in Diamante's brief appears to have omitted Change Orders that resulted in an increase in the Contract Sum.

Burris correctly states the remedy for breach of the Contract as provided in section 12.2.4 of the A201 General Conditions. Burris also provided a detailed comparison between the Glowka and Pina cost analysis. The Arbitrator determines that the alternative cost analysis to repair and complete the existing structure is reasonable because demolition to the ground will constitute economic waste. Comparing the Glowka January 2018 cost estimate of $3,040,990.50 (includes allowances), with the modified Pina analysis of $4,493,067.36 (includes allowances), reflects an increase from January 2018 to January 2022 of $1,452,076.86. This increase reflects the additional items of repair discovered after the January 2018 Glowka estimate, along with increases in cost over the that three year period up to the hearing.

Burris also seeks recovery of his expert fees relating to the investigation in the amount of $66,501. The Arbitrator is familiar with the reports and the investigation. The Arbitrator finds that each of the expert's work and respective charges are reasonable and necessary considering the size of the Project and the scope of issues to analyze, including the various defenses asserted regarding responsibility and necessity of repair.

In analyzing the damage models presented by Burris and Diamante, the Arbitrator determines the following:

| | |
|---|---|
| Reasonable and necessary cost to correct and complete the Project: | $4,493,067.36 |
| Reduction for failure to mitigate: | $512,209.68 |
| Reduction for remaining Contract balance at the time of termination: | $1,217,765.41 |
| Cost of investigation: | $66,501 |
| Total Principal Award | $2,829,593.27 |

The Contract includes a waiver of consequential damages as specifically defined in section 15.1.6 of the A201 General Conditions. Indeed, Burris did not seek any of the damages defined in section 15.1.6 and none of the damages included in this Award constitute any of the waived damages.

**Attorneys' Fees and Expenses**

Burris seeks its attorneys' fees for Diamante's breach of the contract. In support of his attorneys' fees claim Burris submits evidence from his counsel with voluminous, detailed billing statements. Burris

has attached hundreds of pages of highly detailed billing entries to track what work was being done by particular attorneys. While Diamante correctly points out that Burris' attorneys' fees also include time that related to other parties, some portion of that effort was caused by Diamante's withholding of the settlement proceeds from Burris. As Ms. Sanders notes in her affidavit, this case is primarily a breach of contract and declaratory judgment matter. Ms. Sanders' affidavit seeks $731,754.33 as reasonable and necessary attorneys' fees. I have disallowed part of the fees in the amount of $16,987.50 based on my review of the time records that reflects some duplicative effort. Based on the evidence, and in accordance with Texas law and the AAA Construction Industry Rules, I award the following fees and expenses to Burris:

a.   Reasonable and necessary attorneys' fees of $714,766.68 through the final briefing;

b.   $3,000 in the event a Motion to Confirm Award is filed;

c.   $15,000 conditioned on Burris successfully defending a challenge to the Award by Motion to Modify or Motion to Vacate;

d.   $50,000 conditioned on Diamante unsuccessfully appealing the Award and/or Final Judgment to an intermediate court of appeals;

e.   $30,000 conditioned on Diamante unsuccessfully appealing the Award and/or the Final Judgment to the Texas Supreme Court;

f.   Court costs of $33,658.15;

g.   Burris' share of the Arbitrator's fees in the amount of $15,050;

h.   Burris' costs for rental of the facility in the amount of $3,724.27

## AWARD

For all of the reasons stated above, the Arbitrator ORDERS the following:

1.   Burris shall recover directly from Diamante the sum of $2,829,593.27 as damages for Diamante's breaches of the Contract Documents. Contingent on Diamante's delivery of the $321,600.35 in insurance proceeds to Burris within 30 days of this Award, the Award will be reduced to $2,507,992.92.

2.    Burris shall recover directly from Diamante prejudgment interest at the rate of 5% per annum on the foregoing amount (whichever amount is applicable depending on the payment of the insurance proceeds to Burris within 30 days of the Award), which shall accrue from the date that Burris filed its lawsuit against Diamante through April 22, 2022.

3.    Burris shall recover from Diamante the sum of $767,199.10 as reasonable and necessary attorneys' fees and expenses, Arbitration fees and expenses, and venue fees.

4.    The portion of these fees recoverable by Diamante against Corey Construction and Donato Rodriguez are addressed in the indemnity award below.  All other Arbitration fees and venue expenses shall be borne as incurred.

5.    Diamante shall recover from Corey Construction the following sums:

   a.   $300,000 for the portion of Burris' damages attributable Corey Construction.

   b.   $85,071.43 for the portion of Burris' attorneys' fees, expenses, and expert costs calculated at 9.8% of $833,700.10 ($767,199.10 plus $66,501).

6.  Diamante shall recover from Donato Rodriguez the following sums:

   a.   $298,933 for the portion of Burris' damages attributable to Donato Rodriguez.

   b.   $85,071.43 for the portion of Burris' attorneys' fees, expenses, and expert costs calculated at 9.8% of $833,700.10.

7.    This Award is in full settlement of all claims and counterclaims submitted to this Arbitration.  This Award is to be paid within 30 days of this Award, otherwise, Post-Award Interest shall accrue at the simple rate of five percent (5%) per annum starting 30 days after the date of the Award until paid in full.

8.    This Award is final, binding, and in full settlement of all claims, counterclaims and defenses submitted in this arbitration.  All claims and defenses not expressly granted herein are hereby denied.

9.    This Award may be entered as judgment in any court of competent jurisdiction.

It is so ORDERED this the 22nd day of April, 2022.

Matthew J. Sullivan
Arbitrator